UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA

```
_____
                                    )
SECURITY NATIONAL INSURANCE         )
COMPANY,                            )
                                    )
              Plaintiff,            )
                                    )
      v.                            )    CIVIL ACTION
                                    )    NO. 17-00060-WGY
H.O.M.E., INC., and                 )
LAURIS MOLBERT,                     )
                                    )
              Defendants.           )
_____)
```

YOUNG, D.J.[1]                                    May 18, 2018

## MEMORANDUM AND ORDER

### I.    INTRODUCTION

This diversity suit asks this Court to construe two

provisions of a Directors & Officers liability insurance policy

(the "D&O Policy") between Security National Insurance Company

("Security National") and H.O.M.E., Inc. ("H.O.M.E."), a

closely-held company incorporated under the laws of North

Dakota.  Security National seeks declaratory relief stating it

has no obligation to pay for any costs or losses resulting from

the legal defense of H.O.M.E.'s President, Lauris Molbert, in an

unrelated suit brought against him by his three siblings.

Because the siblings allege their brother acted simultaneously

---

[1] Of the District of Massachusetts, sitting by designation.

in covered and noncovered capacities, the Court must determine as a threshold matter whether the siblings' suit is covered under the policy, which limits coverage to "insured persons acting solely in their capacity as director [or] officer." If the Court finds coverage it must then decide whether the insurance company is nevertheless exempted from coverage under the policy's exception for suits brought by "any insured person in any capacity." Specifically, the Court must decide whether the siblings' joint claims are excepted given that one of the siblings is also an insured person under the policy.

Because the language of the insurance policy is clear on its face, Security National is entitled to judgment as matter of law. For the reasons stated herein, the Court grants Security National's motion for summary judgment and denies H.O.M.E.'s motion for partial summary judgment.

## II.  UNDISPUTED FACTS[2]

### A.  Allegations in the Underlying Litigation Giving Rise to the Instant Action.

 Ralph Molbert co-founded H.O.M.E., the parent corporation of Northland Financial (the "Bank") and Northland Insurance Company. Mem. Defs.' Supp. Mot. Partial Summ. J. ("Defs.'

---

[2] Local Rules for the District of North Dakota permit parties moving for summary judgment to include statements of uncontested facts in narrative form within the memorandum supporting their motion. D.N.D. Civ. L.R. 7.1(A)(2). Accordingly, citations are to both parties' memoranda on points that are not contested.

Mem.") 2, ECF No. 20; Mem. Supp. Pl.'s Mot. Summ. J. ("Pl.'s Mem.") 3, ECF No. 25.  During the 1990s, he began to transfer some of his shares in H.O.M.E., via a stock purchase agreement, to his four children: Lauris Molbert ("Lauris"), Kristi Benz ("Kristi"), Karna Kornkven ("Karna"), and Eric Molbert ("Eric"). Pl.'s Mem. 3; Defs.' Mem. 4.  For the past twenty years, Lauris has served as President and a director of H.O.M.E.  Pl.'s Mem. 2; Defs.' Mem. 2.  Lauris is a licensed attorney in North Dakota and has provided legal advice to the Bank as an independent contractor.  Pl.'s Mem. 3; H.O.M.E. Answer & Countercl. ("H.O.M.E. Answer") ¶ 16, ECF No. 6; Compl. ¶ 3; Lauris Molbert Answer & Countercl. ("Molbert Answer") ¶ 16, ECF No. 8.  In 2005, Kristi began serving as a director at the Bank.  Pl.'s Mem. 3; H.O.M.E. Answer ¶ 4; Molbert Answer ¶ 4.

In 2015, Lauris sued Kristi, Karna, and Eric to enforce a provision in the stock purchase agreement that would allow him to exercise a call option and buy his siblings' shares.  Compl. Ex. A., ECF No. 1-1; Defs.' Mem. 4.  Kristi, Karna, and Eric jointly filed an answer in which they alleged nine counterclaims against Lauris.  Compl. Ex. B, Answer & Countercl. ("Siblings' Countercl.") ECF No. 1-2; Defs.' Mem. 4.  The counterclaims form a single docket entry and make no distinction between the counter-claimants.  Siblings' Countercl. 15-25; Pl.'s Mem. 5; Defs.' Mem. 4-5.  Specifically, the siblings alleged:

1. Fraud related to the stock purchase agreement.
Siblings' Countercl. 15.

2. Breach of fiduciary duty as a "shareholder, officer,
director, and controller of, and as an attorney
representing H.O.M.E." Id. at 16.

3. Breach of fiduciary duty as a Trustee of the Molbert
Farms Limited Partnership. Id. at 17.

4. Breach of fiduciary duty as "an attorney providing legal
advice" to the siblings. Id. at 19.

5. Breach of fiduciary duty as a Trustee of the Ralph N.
Molbert's Family Trust and two marital trusts. Id. at 20.

6. Violation of N.D.C.C. § 10-19.1-115, which prohibits
directors from acting "in an unfairly prejudicial manner"
toward shareholders. Id. at 21.

7. Violation of N.D.C.C. § 10-19.1-50 by failing to
discharge his duties as a director in good faith and in the
best interest of the corporation. Id. at 22.

8. Declaratory judgment stating that the Stock Purchase
Agreement is not enforceable. Id. at 23.

9. Unjust enrichment for tortious and inequitable conduct.
Id. at 24.

All the above claims arise from an event in 1993, in which the
siblings allege Lauris presented the stock purchase agreement
for them to sign and misrepresented various provisions relating

to his ability to exercise the call option on their shares.  Id.
at 13–14.

**B.    Undisputed Facts Surrounding Security National's**
**      Denial of Liability Insurance Coverage.**

In his capacity as President and a director of H.O.M.E.,
Lauris emailed Security National, H.O.M.E.'s D&O liability
insurance provider, to request coverage for the costs of
defending him against the siblings' counterclaims.  Aff. Counsel
Supp. of Security National's Mot. Summ. J. ("Pl.'s Aff."), Ex.
8, ECF No. 26-8; Pl.'s Mem. 6; Defs.' Mem. 5.  Security National
responded with a letter denying coverage based on the D&O
Policy's Insured vs. Insured Exclusion while also reserving the
right to deny coverage based on other provisions.  Compl., Ex.
D, Aug. 10, 2015 Letter from Security National to H.O.M.E.
("Rejection Letter") 10–11, ECF No. 1-4; Pl.'s Mem. 6; Defs.'
Mem. 5.  The Insured v. Insured Exclusion ("IvI Exclusion")
provides that Security National will not be liable to cover "any
claim[3] by, on behalf of, or at the behest of . . . any insured
person in any capacity."  Compl., Ex. C, Directors and Officers
Liability Insurance Policy ("D&O Policy") 17–18 (Section
IV.A.20), ECF No. 1-3.  Because directors and officers of
H.O.M.E.'s subsidiaries are insured under the Policy, and Kristi
was a director at the Bank, Kristi was an insured person under

_____

[3] All underlined terms have specially defined meanings
within the D&O policy.

[5]

the D&O Policy -- a fact that is not contested.  Pl.'s Mem. 11;
Defs.' Mem. 12.  The initial letter denying coverage stated that
as an insured person, Kristi's counterclaims against Lauris, who
was also an insured person, brought "her claim within the scope
of the insured-versus-insured exclusion."  Rejection Letter 10.

In correspondences between the parties at the end of 2015,
Security National reaffirmed its denial of coverage several
times and reserved all rights and defenses with regard to
coverage.  Pl.'s Aff., Ex. 9, ECF 26-9; Pl.'s Aff., Ex. 10, ECF
26-10; Defs.' Mem. 5.  Security National nevertheless agreed to
cover some defense costs under an arrangement, the terms of
which are currently disputed by the parties.  Defs.' Mem. 5;
Defs.' Mem. Opp'n Pl.'s Mot. Summ. J. ("Defs.' Opp'n") 3-4, ECF
No. 32; Pl.'s Mem. Opp'n Defs.' Partial Mot. Summ. J. ("Pl.'s
Opp'n") 3-5, ECF No. 30.  Under this contested arrangement,
Security National paid, over the course of the following year,
around $142,000 in defense costs.  Defs.' Mem. 6; Compl. 10.

In a subsequent letter to H.O.M.E., Security National
described the coverage arrangement as a "provisional offer to
reimburse . . . defense costs for the Lawsuit . . . as an
accommodation to the insureds, and in order to potentially avoid
the expense of a declaratory judgment action."  Pl.'s Aff., Ex.
11, at 2, ECF 26-11; Pl.'s Mem. 6; Defs.' Mem. 5.  Lauris and
H.O.M.E. dispute this characterization and argue the arrangement

was made pursuant to Security National's obligation under Section VIII.B of the D&O Policy to "pay defense expenses, determined by the Insurer to be part of a covered loss, on a current basis." Defs.' Opp'n 3-4, 24-25. In addition to contesting the extent and nature of this arrangement, the parties dispute whether H.O.M.E. exceeded the agreed upon coverage by hiring a different lawyer and whether Security National withdrew coverage prior to the trial in the underlying litigation. Defs.' Opp'n 3-4; Defs.' Mem. 5 n.1; Pl.'s Opp'n 5.

## III. ANALYSIS

### A.   Legal Framework

#### 1.   Standard of Review for Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The "interpretation and construction of insurance policies is a matter of law, and therefore, issues involving the duty to defend are particularly amenable to summary judgment." First S. Ins. Co. v. Jim Lynch Enters., Inc., 932 F.2d 717, 719 (8th Cir. 1991); John Deere Ins. Co. v. Shamrock Indus., Inc., 929 F.2d 413, 417 (8th Cir. 1991).

The Court is not asked to determine the nature of the temporary coverage arrangement or whether either party breached its obligations under it.  Pl.'s Mot. Summ. J., ECF No. 24; Defs.' Partial Mot. Summ. J., ECF No. 19.  The Court is tasked only with resolving whether the counterclaims in the underlying litigation give rise to a legal obligation to cover any costs or losses associated with Lauris's legal defense.  Pl.'s Mot. Summ. J.; Defs.' Partial Mot. Summ. J.

H.O.M.E. argues "[a]t a minimum, Security National's motion for summary judgment should be denied" to permit discovery "into Security National's drafting intent, internal claims handling manuals and guidelines, and claims-handling intentions in paying over $140,000 in defense costs."  Defs.' Opp'n 24.  Yet this argument assumes the parties' intent cannot by determined by the "four corners" of the D&O Policy.  In North Dakota, "intention of the parties is to be ascertained from the writing alone if possible."  N.D. Cent. Code § 9-07-04 (2017).  Indeed, "extrinsic evidence is not admissible to alter, vary, explain, or change the contract" if "the parties' intentions can be ascertained from the writing alone."  Hallin v. Inland Oil & Gas Corp., 903 N.W.2d 61, 64 (N.D. 2017).  "When the parties' intent can be determined from the contract language alone, interpretation of a contract presents a question of law."  THR Minerals, LLC v. Robinson, 892 N.W.2d 193, 197 (N.D. 2017)

(quoting <u>Border Res., LLC</u> v. <u>Irish Oil & Gas, Inc.</u>, 869 N.W.2d 758, 763 (N.D. 2015)).

Because Security National posits its obligation to defend can be determined based on the unambiguous terms of the D&O Policy, it is entitled to summary judgment if the court can effectuate the parties' intent based on the Policy's language. See <u>Hallin</u>, 903 N.W.2d at 64.

## 2. General Principles of Insurance Policy Interpretation in North Dakota

The North Dakota Supreme Court has provided extensive guidance on how it interprets insurance policies:

> Our goal when interpreting insurance policies, as when construing other contracts, is to give effect to the mutual intention of the parties as it existed at the time of contracting. We look first to the language of the insurance contract, and if the policy language is clear on its face, there is no room for construction. "If coverage hinges on an undefined term, we apply the plain, ordinary meaning of the term in interpreting the contract." While we regard insurance policies as adhesion contracts and resolve ambiguities in favor of the insured, we will not rewrite a contract to impose liability on an insurer if the policy unambiguously precludes coverage. We will not strain the definition of an undefined term to provide coverage for the insured. We construe insurance contracts as a whole to give meaning and effect to each clause, if possible. The whole of a contract is to be taken together to give effect to every part, and each clause is to help interpret the others.
>
> Exclusions from coverage in an insurance contract must be clear and explicit and are strictly construed against the insurer. Although [a policy's exclusionary clauses are strictly construed, this Court] will not rewrite a contract to impose liability

on an insurer if the policy unambiguously precludes
coverage.

State v. North Dakota State Univ., 694 N.W.2d 225, 229 (N.D.
2005) (first paragraph quoting Ziegelmann v. TMG Life Ins. Co.,
607 N.W.2d 898, 900 (N.D. 2000); second paragraph citing
Nationwide Mut. Ins. Cos. v. Lagodinski, 683 N.W.2d 903, 907
(N.D. 2004)).  Specifically in the context of construing
exceptions to liability insurance policies, it has explained:

> [I]n interpreting an insurance policy, we will first
> examine the coverages provided by the policy before
> examining a policy's exclusions.  If and only if a
> coverage provision applies to the harm at issue will
> the court then examine the policy's exclusions and
> limitations of coverage.  An exclusionary provision,
> or the absence of one, cannot be read to provide
> coverage that does not otherwise exist.  Likewise,
> although an exception to an exclusion from coverage
> results in coverage, an exception to an exclusion is
> incapable of initially providing coverage; rather, an
> exception may become applicable if, and only if, there
> is an initial grant of coverage under the policy and
> the relevant exclusion containing the exception
> operates to preclude coverage.

K & L Homes, Inc. v. Am. Family Mut. Ins. Co., 829 N.W.2d 724,
728 (N.D. 2013) (citations omitted).

This approach counsels against Security National's
invitation to construe the IvI Exclusion prior to determining
whether the Policy even covers the siblings' counterclaims.

### 3. North Dakota Law Construing Insurers' Duty to Advance Costs

The duty to advance costs in a D&O Policy is treated
virtually the same as the duty to defend, with the exception

that the insurer is not required to control the litigation.
Liberty Mut. Ins. Co. v. Pella Corp., 650 F.3d 1161, 1170 (8th
Cir. 2011) (interpreting Iowa law but noting "state courts
generally have viewed an insurer's duty to advance defense costs
as an obligation congruent to the insurer's duty to defend"
(quoting Federal Ins. Co. v. Sammons Fin. Grp., Inc., 595 F.
Supp. 2d 962, 976 (S.D. Iowa 2009))). In Tibert v. Nodak Mut.
Ins. Co., 816 N.W.2d 31 (N.D. 2012), the North Dakota Supreme
Court summarized its holdings construing insurers' duty to
defend:

> An insurer's duty to defend is broader than the
> duty to indemnify, and is generally determined by the
> allegations of the injured claimant. We have outlined
> the parameters of an insurer's duty to defend:
>
> A liability insurer's obligation to defend its
> insured is ordinarily measured by the terms of the
> insurance policy and the pleading of the claimant who
> sues the insured. If the allegations of the claimant's
> complaint could support recovery upon a risk covered
> under the insurer's policy, a liability insurer has a
> duty to defend its insured. We have formulated the
> duty to defend to require a liability insurer to
> defend an underlying action against its insured if the
> allegations in the complaint give rise to potential
> liability or a possibility of coverage under the
> insurance policy.
>
> When several claims are made against the insured in
> the underlying action, the insurer has a duty to
> defend the entire lawsuit if there is potential
> liability or a possibility of coverage for any one of
> the claims.
>
> Any doubt about whether a duty to defend exists
> must be resolved in favor of the insured. Thus, when
> there is doubt whether the injured party's complaint

states facts sufficient to bring the injury within the
coverage of the insurance policy, and the claim "may
or may not be covered by the policy," the insurer has
a duty to defend. <u>Only if there is no possibility of
coverage is the insurer relieved of its duty to
defend</u>.

. . .

The duty to indemnify is premised upon the ultimate
resolution of the underlying lawsuit and the actual
basis for any liability of the insured.  The duty to
defend, however, arises as soon as the insured is
sued, and accordingly is determined on the basis of
the allegations in the injured claimant's complaint.
<u>Because the duty to defend is determined by the
allegations in the complaint examined as of the time
the complaint was served and the defense was tendered
to the insurer, the ultimate result in the case does
not affect the duty to defend</u>.

<u>Id.</u> at 42–44 (citations and quotations omitted) (emphasis
added).

H.O.M.E.'s D&O Policy requires National Security to pay or
reimburse H.O.M.E. on a "current basis," for any "<u>defense
expenses</u>" or "<u>loss</u>" incurred as a result of a covered "<u>claim</u>."
D&O Policy 11, 22.  Thus, per the North Dakota Supreme Court's
guidance, Security National is liable "if the allegations in the
complaint [of the underlying litigation] give rise to potential
liability or a possibility of coverage" where any doubt is
"resolved in favor of the insured" and Security National escapes
liability only "if there is no possibility of coverage."
<u>Tibert</u>, 816 N.W.2d at 42–43.

**B.   Whether the Siblings' Counterclaims Constitute a
       Covered Claim Under the D&O Policy**

Beginning with the text of the D&O Policy, the sections

titled "Insuring Agreements" A & B set forth the extent of the

coverage for insured persons and the company, respectively:

> A. The Insurer will pay on behalf of an <u>insured person</u>,
> <u>loss</u> that is a result of a <u>claim</u> for a <u>management
> practices wrongful act</u> first made during the <u>policy
> period</u> or during the Extended Reporting Period, if
> exercised, except to the extent that the <u>company</u> has
> indemnified the <u>insured person</u> for such <u>loss</u>.
>
> B. The Insurer will pay on behalf of the <u>company</u>, <u>loss</u>
> that is the result of a <u>claim</u> for a <u>management
> practices wrongful act</u> first made during the <u>policy
> period</u> or during the Extended Reported Period, if
> exercised, and for which the <u>company</u> has, to the
> extent required or permitted by law, indemnified any
> <u>insured person</u>.

D&O Policy 11.  The meanings of the underlined terms, which as

noted above are defined within the Policy, appear to be agreed

upon except for the defined phrase "<u>management practices

wrongful act</u>."  In other words, there is no dispute over whether

Lauris is an "insured person" or whether H.O.M.E. is the

"company" referenced in the Insuring Agreements.  Defs.' Mem.

11; Pl.'s Mem. 10–11.  The parties agree that the siblings'

counterclaims satisfy the Policy's definition of "claim" as used

above.  Defs.' Mem. 11; Compl. ¶ 81.

Thus the inquiry into whether H.O.M.E. is covered under the

Policy depends on whether the siblings' counterclaim qualifies

as a claim for a "management practices wrongful act," which the
Policy defines, in relevant part, as:

> [A]ny actual or alleged, misstatement, misleading
> statement, error or omission, or neglect or breach of
> duty by an <u>insured person</u> acting solely in their
> capacity as . . . director, officer, trustee, member
> of an advisory board or committee, volunteer,
> organizer or <u>employee</u> of the <u>company</u>.

D&O Policy 15.  The siblings' counterclaims alleging breach of
fiduciary duty and fraud satisfy the first part of "management
wrongful practices act"; it is the meaning of the phrase "acting
solely in their capacity as . . . director or officer" the
parties contest.  Pl.'s Mem. 15; Defs.' Mem. 6-8.

As discussed above, the siblings' nine claims arise from an
event in 1993 in which they allege Lauris fraudulently induced
them into the stock purchase agreement by misrepresenting the
nature of certain provisions.  Siblings' Countercl. 15-25.  The
counterclaims allege Lauris wore many hats, both in the company
and outside of it, that gave rise to fiduciary duties.  <u>Id.</u>
Consequently, several of the claims are repetitive and assert
the same actions as violating the duties imputed on him by
virtue of his alleged positions.  <u>Id.</u>  For example, in Claim II
the siblings allege Lauris breached the fiduciary duties he owed
the three of them by virtue of his role as "a shareholder,
officer, director, and controller of, and as an attorney
representing H.O.M.E."  Claims III and V allege the same

behavior constituted a breach of Lauris's fiduciary duties as a trustee of various family trusts.  Id. at 17-20.  In Count IV, the counterclaims allege the same actions violated his duties as "an attorney providing legal advice" to the three of them.  Id. at 19.

H.O.M.E. notes that two of the siblings' counterclaims (VI & VII) are based on North Dakota statutes applicable only to directors and officers and therefore argues the counterclaims allege misconduct solely in Lauris's capacity as a director. Defs.' Opp'n 6.  It further argues Security National is putting "the cart before the horse" by treating the counterclaims as adjudicated facts.  That is, just because the siblings have alleged multiple capacities ought not deprive Lauris of coverage -- "it is enough that there is a potential coverage for some of the claims against Lauris."  Id. at 7-8, 11.  Finally, H.O.M.E. contends that recognizing Security National's argument would lead to absurd results; it would preclude coverage "anytime a claimant pleads alternative claims," or "mak[es] allegations of wrongful acts in any [other] capacity."  Id. at 8.  A director's coverage, H.O.M.E. posits, ought not hinge on the "panoply of claims" a plaintiff chooses to make.  Id.

Security National focuses on the use of the word "solely" to argue the counterclaims must seek relief for actions taken "exclusively and only" in a specified capacity in order to

constitute a claim of a "management practices wrongful act."
Pl.'s Mem. 15. Security National contends, "[t]he word 'solely'
is not ambiguous or unclear. It . . . does not contemplate or
include the idea of concurrent or overlapping capacities." Id.
It also points to the language in the definition which focuses
on the underlying action of the insured person and not on the
theory of liability. Pl.'s Opp'n 24. In short, because the
siblings' counterclaims all rely on a "common course of conduct"
without alleging any action that Lauris performed only as a
director or officer of H.O.M.E., Security National argues the
siblings do not claim a "management practices wrongful act" as
defined in the Policy. Pl.'s Opp'n 24; Pl.'s Mem. 15.

There is no controlling North Dakota case interpreting a
similar provision. In McAninch v. Wintermute, 491 F.3d 759 (8th
Cir. 2007), however, the Eighth Circuit interpreted a similar
provision, which limited liability coverage to losses "by reason
of any Wrongful Act solely in their capacities of Director or
Officer." Id. at 761-63. Applying Minnesota law (which does
not appear to be inconsistent with North Dakota law in this
respect), the Eighth Circuit held the insurer was liable because
the underlying "indictment clearly alleges wrongful conduct
against [the defendant] undertaken in her capacity as a
director." Id. at 771. The McAninch panel explained its
rationale:

We conclude that an insurer may not avoid its duty to
indemnify for alleged wrongful conduct merely by
arguing the director was also an owner, shareholder,
etc., without some explanation as to how this dual
capacity relates to or facilitated the wrongful
conduct alleged. To hold otherwise would invite
carriers to deny coverage based on factors unrelated
to the risk underwritten.

Id. at 772. Because the insurer in McAninch did not explain how

the director's "dual capacity" facilitated the alleged

wrongdoing, other cases have seized on this distinction to

distinguish McAninch. See, e.g., Carlson v. Twin City Fire Ins.

Co., No. CIV. 09-608, 2009 WL 1793887, at *5 (D. Minn. June 23,

2009) (denying coverage because the director's wrongdoing was

made possible by utilizing confidential information in a

separate capacity). Relatedly, other jurisdictions apply a "but

for" test, essentially looking to whether the covered claim

could stand independently from the alleged conduct performed in

a non-covered capacity. Langdale Co. v. National Union Fire

Ins. Co. of Pittsburgh, Penn., 609 F. App'x 578, 588 (11th Cir.

2015) ("Claims arise out of [t]he excluded conduct when 'but

for' that conduct, there could be no claim against the insured."

(quoting Langdale Co. v. National Union Fire Ins. Co. of

Pittsburgh, Penn., 110 F. Supp. 3d 1285, 1307 (N.D. Ga. 2014))).

Finally, some courts have looked to whether the director's

actions were "inextricably intertwined" with a non-covered

capacity.  See, e.g., Yocum v. St. Paul Mercury Ins. Co., No.
5:09-CV-00123, 2010 WL 2179137, at *6 (E.D. Ark. May 27, 2010).

It is irrelevant in what capacity, if any, Lauris is
ultimately found to have breached his fiduciary duties.  See
Homebank of Ark. v. Kansas Bankers Sur. Co., No. 4:06CV001670,
2008 WL 2704670, at *5 (E.D. Ark. July 7, 2008).  As noted
above, coverage claims are decided based entirely on the
allegations in the underlying claim.  Tibert, 816 N.W.2d at 44.
The siblings allege Lauris (a licensed lawyer in North Dakota)
or his law firm prepared the stock purchase agreement and that
Lauris discussed its "legal implications" with them.  Siblings'
Countercl. ¶¶ 93-94.  They also allege that they executed the
agreement "[i]n reliance on [Lauris's] legal advice and
recommendation, and his omissions."  Id. at ¶ 96.  Further,
because of Lauris's "representations of the legal impact" of the
agreement, the siblings claim they believed they would continue
to have a right of first refusal in case of a buyout.  Id. at ¶
97.

The facts in this case are more similar to Federal Sav. &
Loan Ins. Corp. v. Mmahat, 97 B.R. 293 (E.D. La. 1988), in which
the district court ruled that "Mmahat's dishonesty as director
was an integral part of his dishonesty as a lawyer."  Id. at
299.  The Mmahat court ultimately denied coverage based on a
different provision, but it concluded in dicta that "the losses

here at issue cannot be said to have arisen solely from Mmahat's actions as director." Id.

Applying any number of the tests discussed above, it is impossible to extrapolate a claim against Lauris in which he acted "solely" as a director or officer for H.O.M.E. Unlike in McAninch, the siblings allege Lauris's capacity as a lawyer directly facilitated the breach of duties that he owed by virtue of his position as a director or officer. The allegations "inextricably intertwine" his role in providing legal advice with his role as a director and officer. Moreover, "but for" Lauris's legal training, his help preparing the agreement, and the legal advice he provided, it is difficult to understand the siblings' claims.

By disregarding the fact that the counterclaims all arise from the same event, H.O.M.E. conceptually attempts to place each claim in an individual silo in order to contend that the conclusion assumes adjudicated facts. This argument is unavailing, however, because even assuming that Lauris were ultimately found to have breached only his fiduciary duties as a director or officer, H.O.M.E. would still not have a case for coverage. This is because the underlying complaint not only alleges he simultaneously acted in noncovered capacities during all relevant times but also that these capacities aided the breach of his fiduciary duties as director and officer. In

short, it is irrelevant whether Lauris breached his lawyerly
fiduciary duties, the inquiry is whether the counterclaims
allege he was acting as a personal lawyer or another capacity
when he breached his duties as director and officer.

Although any ambiguity, "potential liability," or
"possibility of coverage" is to be construed in favor of the
insured, Tibert, 816 N.W.2d at 42–45, the court "will not
rewrite a contract to impose liability on an insurer if the
policy unambiguously precludes coverage." North Dakota State
Univ., 694 N.W.2d at 229.

### C. Whether the Siblings' Counterclaims Are Excluded from Coverage under the Insured-versus-Insured Exclusion

Even were there some ambiguity with regard to H.O.M.E.'s
coverage of the substance of the siblings' counterclaims (there
is not) the counterclaims are nevertheless excluded from
coverage under the IvI Exclusion. As noted above, it is not
disputed that as a director of the Bank, Kristi Benz was, during
all relevant times, an "insured person" under H.O.M.E.'s D&O
Policy. Defs.' Mem. 12. The other two counterclaimants are not
insured persons but the siblings' counterclaims were, again,
filed jointly and no counterclaim is distinguishable or unique
to any one sibling. Siblings' Countercl. ¶¶ 105–73.
The D&O Policy's IvI Exclusion reads:

> A. The insurer shall not be liable to make any
> payment for loss in connection with any claim

> based upon, arising out of, relating to, in
> consequence of, or in any involving:

. . .

> 20. any <u>claim</u> by, on behalf of, or at the behest
> of the <u>company</u>, any successor or trustee of
> the <u>company</u>, affiliate of the <u>company</u> or any
> <u>insured person</u> in any capacity, except where
> such <u>claim</u> is brought and maintained:
>
> a. in the form of a cross-claim or third-
> party claim for contribution or indemnity
> which is part of and results directly from a
> <u>claim</u> which is not otherwise excluded by the
> terms of the <u>policy</u>;
>
> b. by an <u>insured person</u> solely as a
> customer of the <u>company</u>;
>
> c. by a security holder of the <u>company</u> as
> a derivative action on behalf of the <u>company</u>
> or such affiliate;
>
> provided such <u>claim</u> is brought independently
> of, and totally without the solicitation,
> assistance, participation, or intervention
> of any <u>insured</u> or any affiliate of the
> <u>company</u>[.]

D&O Policy 17-18 (Section IV.A.20).

   H.O.M.E. places great emphasis on the general purpose and

intention of IvI exclusions, which it claims is to prevent

collusive suits, and suggests the IvI Exclusion ought not apply

in this case because there is no hint of collusion in the

underlying litigation. Defs.' Mem. 15. Since ambiguity, under

North Dakota law, is construed in favor of coverage, H.O.M.E.

also points to the fact that Security National agreed to advance

over $140,000 in costs as evidence of the IvI Exclusion

[21]

provision's ambiguity.  <u>Id.</u> at 13 n.4.  H.O.M.E. further posits that finding no coverage is "illogical and contrary to the reasonable expectations of an insured director or officer."  <u>Id.</u> at 14.  Finally, it argues that Security National could have more clearly written the provision to exclude suits that were not brought "solely" by insured persons.  Defs.' Opp'n 13-14.

Security National in turn relies on the exclusion's "plain terms" to show it bars coverage "for all loss 'in connection with' <u>any</u> claim 'relating to' or 'in any way involving' <u>any</u> claim by '<u>any</u> insured person.'"  Pl.'s Mem. 10.  It breaks down the provision into four requirements that, if met, would exclude coverage:

(1) a "claim" -- which is met here, otherwise "no coverage under the policy could be triggered in the first instance";

(2) "by, on behalf of, or at the behest of" -- which is satisfied since "Kristi is named in, and seeks relief in, all nine counts of the counterclaim against her brother Lauris";

(3) "any insured person" -- Kristi undisputedly qualifies; and

(4) the exceptions don't apply -- none of the exceptions to the exclusion are relevant to the counterclaims nor are they asserted by H.O.M.E.

Id. at 11–12.  Security National rejects H.O.M.E.'s contention
that the provision could be written more clearly, accusing it of
"confus[ing] clarity with exhaustive detail."  Pl.'s Opp'n 10.

There appears to be no North Dakota case that has construed
an IvI Exclusion provision, nor do parties cite to any
controlling case law.  Consequently, the Court is to apply the
legal framework set forth above to interpret the exclusion and
predict how the North Dakota Supreme Court would rule on this
question.  Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938);
cf. Miller v. Redwood Toxicology Lab., Inc., 688 F.3d 928, 937
(8th Cir. 2012).

In Jerry's Enterprises, Inc. v. U.S. Specialty Ins. Co.,
845 F.3d 883 (8th Cir. 2017), the Eighth Circuit recently
applied Minnesota law to a similar factual scenario.  Id. at
887-88.  H.O.M.E. emphasizes that Jerry's Enterprises does not
apply North Dakota law but does not point to any differences
between the Minnesota and North Dakota interpretation of
insurance policies.  Defs.' Opp'n 18.  In fact, North Dakota and
Minnesota appear to embrace similar approaches to interpreting
coverage exclusions.  Compare Midwest Family Mut. Ins. Co. v.
Wolters, 831 N.W.2d 628, 636 (Minn. 2013) ("An insurance policy
must be construed as a whole, and unambiguous language must be
given its plain and ordinary meaning." (citations omitted)), and
General Cas. Co. of Wis. v. Wozniak Travel, Inc., 762 N.W.2d

572, 575 (Minn. 2009) (holding exclusions are "narrowly considered" and construed in "favor of finding coverage"), with <u>North Dakota State Univ.</u>, 694 N.W.2d at 229 ("We look first to the language of the insurance contract, and if the policy language is clear on its face, there is no room for construction. . . . Exclusions from coverage in an insurance contract must be clear and explicit and are strictly construed against the insurer." (citations omitted)).

In <u>Jerry's Enterprises</u>, the company's founder gifted shares to his three daughters and grandchildren. 845 F.3d at 885. The founder also specified in his estate plan that upon his death, his daughters would become directors of the company until their shares and the shares of his grandchildren were redeemed. <u>Id.</u> After his death, the plan was effectuated and Cheryl Sullivan, one of the founder's daughters, became a director. <u>Id.</u> She and two of her daughters (who were also gifted shares by their grandfather) disagreed with how the company was valuing their shares and brought suit against the company. <u>Id.</u> The suit was confidentially settled and then Jerry's Enterprises sought coverage for the costs of the settlement from its D&O liability insurer. <u>Id.</u> The insurer refused based primarily on the Policy's IvI Exclusion, since Sullivan, one of the three claimants, was an insured person -- a fact that Jerry's Enterprises did not contest. <u>Id.</u> at 886-88. The IvI Exclusion

Policy at issue there stated, in relevant part, that it excluded from coverage any claim:

> [B]rought by or on behalf of, or in the name or right of . . . any Insured Person, unless such Claim is: (1) brought and maintained independently of, and without the solicitation, assistance or active participation of . . . any Insured Person. . . .

Id. at 886. The Eighth Circuit held coverage was excluded under a "seemingly straightforward application of the exclusion clause." Id. at 888. It stated: "Here, the exclusion clause contains no ambiguity, and we must not read ambiguities into its language." Id.

H.O.M.E. mistakenly relies on differences between the last clauses in the exclusion in this case and the one in Jerry's Enterprises to argue that Security National could have adopted similar language to make the exclusion clearer. Defs.' Opp'n 18–19. Such reliance is misplaced; although the clauses use similar language, they serve distinct functions. A side-by-side comparison of the exclusions manifests these fundamental differences:

| Jerry's Enterprises | H.O.M.E. D&O Policy |
|---|---|
| "The Insured vs. Insured exception excludes from coverage under the Policy any claims: | The insurer shall not be liable to make any payment for <u>loss</u> in connection with any <u>claim</u> based upon, arising out of, relating to, in consequence of, or in any involving: |
| [B]rought by or on behalf of, or in the name or right of . . . any <u>Insured Person</u>, unless such <u>Claim</u> is: | 20. any <u>claim</u> by, on behalf of, or at the behest of . . . any <u>insured person</u> in any capacity, except where such <u>claim</u> is brought and maintained:<br><br>    [Three exceptions that<br>    don't apply] |
| (1) brought and maintained independently of, and without the solicitation, assistance or active participation of, the <u>Insured Organization</u> or any <u>Insured Person</u>"[4] | provided such <u>claim</u> is brought independently of, and totally without the solicitation, assistance, participation, or intervention of any <u>insured</u> or any affiliate of the company; |

The language "assistance or active participation" constitutes an <u>exception</u> to the exclusion clause in <u>Jerry's Enterprises</u> but is an <u>additional qualification</u> to the exceptions in H.O.M.E.'s policy.  That is, the language following the reference to "such claim" in H.O.M.E.'s D&O Policy is only invoked in and applies if the claim were otherwise excepted from the exclusion.  None of the exceptions are relevant, nor does H.O.M.E. contend that

---

[4] <u>Jerry's Enterprises, Inc.</u> v. <u>U.S. Specialty Ins. Co.</u>, 132 F. Supp. 3d 1128, 1132 (D. Minn. 2015).

they are.[5]  Therefore, the only relevant comparison is to the language the Jerry's Enterprises court found actually to exclude coverage.  H.O.M.E.'s D&O Policy in fact provides a narrower exclusion than the one quoted in Jerry's Enterprises -- it applies not only to the claim itself but also to any "claim based upon, arising out of, relating to, in consequence of, or in any way involving" a claim by an insured person.  D&O Policy 17-18 (Section IV.A.20).  As both Minnesota and North Dakota courts recognize an insurance policy's plain meaning as controlling, there does not seem to be any daylight in arguing that the Eighth Circuit is not dispositive here since it concluded the exclusion in Jerry's Enterprises was clear on its face.

H.O.M.E. relies on a host of cases in other circuits that are distinguishable because they relied on an allocation clause to allocate the coverage for the loss between covered and uncovered matters.  H.O.M.E.'s D&O Policy does not contain an allocation clause similar to those cited in the other cases. The only type of allocation the policy contemplates is in the case that a claim is brought against both an insured person/entity and an uninsured person/entity, in which case the

---

[5] Here, it is not contested that the three exceptions apply since Kristi did not bring the counterclaims in a derivative action or solely as a customer of the company and the counterclaims do not form part of a cross-claim of an otherwise excluded claim.  D&O Policy 17-18 (Section IV.A.20).

policy states the Insured and Insurer will agree to "a fair and proper allocation of all amounts" and sets forth the process by which the allocation will be determined. Nevertheless, H.O.M.E. asks this Court to analogize to this provision and allocate the loss of the uncovered matter (Kristi's claim) from the loss of a covered matter (Karna and Eric's claim).

H.O.M.E. invites this Court to apply some concerns raised by Judge Posner in interpreting an IvI Exclusion in Level 3 Communications, Inc. v. Fed. Ins. Co., 168 F.3d 956, 961 (7th Cir. 1999). As a threshold matter, most of Judge Posner's thoughts were dicta since the Seventh Circuit only concluded that coverage was excluded for the insured director but remanded to the district court to consider that policy's allocation clause, which contemplated allocation between "covered and uncovered matters." Id. at 960. It is also worth noting the "insured person" in Level 3 was added six months into the litigation, id. at 957 -- a fact that other jurisdictions have found distinguishable. See, e.g., Sphinx Int'l, Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pa., 412 F.3d 1224, 1230-31 (11th Cir. 2005) (noting "Level 3 Communications is too different to be useful" since the insured person was merely a passive shareholder that joined the suit six months after it was filed and the language in the policies differ). The other cases to which H.O.M.E. cites all have allocation clauses between

covered and uncovered matters or are not relevant for other reasons.  See Vita Food Prod., Inc. v. Navigators Ins. Co., No. 16 C 08210, 2017 WL 2404981, at *8 (N.D. Ill. June 2, 2017) ("We accordingly apply the allocation clause to [Plaintiff]'s claim for coverage."); Home Fed. Sav. & Loan Ass'n of Niles v. Federal Ins. Co., No. 4:06-CV-3053, 2007 WL 2713060, at *4 (N.D. Ohio Sept. 14, 2007) (agreeing that "allocation provision explains how the policy will cover lawsuits that include both covered and uncovered matters"); Bodewes v. Ulico Cas. Co., 336 F. Supp. 2d 263, 273 (W.D.N.Y. 2004) (examining coverage of an ERISA claim under a Trustee & Fiduciary Liability Policy and referring to cases involving D&O Policies as "neither entirely accurate nor entirely helpful").

H.O.M.E.'s assertion that Security National's willingness to provide temporary coverage is evidence of ambiguity is tantamount to disregarding its explicit reservation of rights. See Defs.' Mem. 13 n.4.  H.O.M.E. states "nothing has changed" since Security National first decided to provide provisional coverage, id. at 6 n.2, but this ignores the state of the information before Security National when it made the provisional determination.  Provisional coverage with a reservation of rights is a fairly common and recognized practice in North Dakota.  See, e.g., K & L Homes, Inc., 829 N.W.2d at

727; <u>Farmers Union Mut. Ins. Co.</u> v. <u>Decker</u>, 704 N.W.2d 857, 868 (N.D. 2005).

Nor is the Court persuaded by H.O.M.E.'s attempt to invoke the "reasonable expectations" doctrine. The North Dakota Supreme Court has "expressly declined to adopt the doctrine of reasonable expectations" in the context of insurance policies. <u>Huether</u> v. <u>Nodak Mut. Ins. Co.</u>, 871 N.W.2d 444, 448 (N.D. 2015) (quoting <u>Nationwide Mut. Ins. Co.</u> v. <u>Lagodinski</u>, 683 N.W.2d 903, 911-12 (N.D. 2004)). Moreover, this doctrine would only apply if the language in the policy were found to be "sufficiently ambiguous." <u>Id.</u>

Finally, H.O.M.E.'s arguments that the IvI exclusion ought not be applied here because the underlying litigation is not collusive is undermined by other recognized rationales for the exclusion. In <u>Level 3</u>, the case on which H.O.M.E. relies for its allocation argument, Judge Posner recognized that the IvI exclusion's purpose is also to prevent "suits arising out of those particularly bitter disputes that erupt when members of a corporate, as of a personal, family have a falling out and fall to quarreling." 168 F.3d at 958. As Security National points out, preventing coverage for family disputes is particularly appropriate in cases dealing with "closely-held family businesses." Pls.' Opp'n 21.

## IV.  CONCLUSION

For the foregoing reasons, the Court grants Security National's motion for summary judgment and denies H.O.M.E.'s motion for partial summary judgment.  Judgment shall enter declaring that Security National is not obligated to provide coverage to H.O.M.E.

**SO ORDERED.**

                                        /s/ William G. Young
                                        WILLIAM G. YOUNG
                                        DISTRICT JUDGE